**SIERRA CLUB, a California nonprofit corporation; Nevada Outdoor Recreational Association, a Nevada nonprofit corporation, Plaintiffs-Appellants,**

**v.**

**John LEHMAN, as Secretary of the Navy; and, Elizabeth Dole, as Secretary of Transportation, Defendants-Appellees.**

No. 86–2816.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 14, 1987.

Decided Aug. 21, 1987.

As Amended on Denial of Rehearing Nov. 10, 1987.

Laurens H. Silver, San Francisco, Cal., for plaintiffs-appellants.

Anne S. Almy, Washington, D.C., for defendants-appellees.

Before SKOPIL, FARRIS and O'SCANNLAIN, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

The Sierra Club and the Nevada Outdoor Recreational Association brought suit against the Secretary of the Navy and the Secretary of Transportation, alleging that the Secretary of the Navy acted *ultra vires* in allocating navigable airspace without the approval of the Federal Aviation Administration. The district court granted summary judgment for the defendants, and we affirm.

### FACTS AND PROCEEDINGS BELOW

Naval Air Station ("NAS") Fallon is located in central Nevada, sixty miles east of Carson City. The purpose of NAS Fallon is to provide air warfare training facilities for all Navy and Marine Corps airbases in the western United States, and to provide training for carrier airwings prior to their

deployment. In addition to the base itself, NAS Fallon operates several aerial weapons ranges and electronic tracking systems east of the base. The Federal Aviation Administration ("FAA"), pursuant to FAA regulations, has designated the areas over the aerial weapons ranges as Restricted Airspace, which is a category of special use airspace as defined by the FAA.[1]

In 1977 the Navy requested that the FAA designate a large portion of the airspace east of NAS Fallon as a Military Operations Area ("MOA"). An MOA is a category of special use airspace designated by the FAA to warn of particular concentrations of airspace use. The FAA approved the designation and the Navy named the area the Gabbs MOA. The Gabbs airspace had been used previously as a military training area, but the MOA designation provided additional warning to aircraft through publication in FAA aeronautical charts.

One year later the Navy modified the boundaries of the Gabbs MOA and divided it into two sections: Gabbs North and Gabbs South. The Navy also requested that the FAA designate another MOA to the east of and adjacent to Gabbs, to be named the Austin MOA, in order to provide additional area for air combat maneuvering training. The Navy prepared an Environmental Assessment for this proposal, noting that "[m]issions will consist of up to 40 aircraft with speed varying from 250 knots to occasionally supersonic. Supersonic flight will principally be conducted in [restricted airspace] with occasional use of the Eastern portion of the GABBS

MOA/ATCAA and contiguous western portion of AUSTIN 1 MOA/ATCAA" ("Environmental Impact Assessment for Special Use Airspace, NAS Fallon, Nevada," at 1, June 11, 1979). The Environmental Assessment anticipated that "the MOA/ATCAA will be utilized daily ... 6 days per week, 52 weeks per year" (*Id.* at 2). The FAA approved the Austin MOA designation in 1979.

In 1982 the Navy announced that it planned to establish what it referred to as a "Supersonic Operations Area" ("SOA") to the east of NAS Fallon. The proposed SOA was to overlie approximately 5,500 square miles of land within the lateral boundaries of the Gabbs and Austin MOAs, and extend from 11,000 feet above mean sea level ("MSL") to 58,000 feet MSL. The Gabbs and Austin MOAs extend from 100 feet above ground level ("AGL") to 18,000 feet MSL. The airspace directly over the Gabbs and Austin MOAs, from 18,000 feet MSL to 60,000 feet MSL, is designated as Air Traffic Control Assigned Airspace ("ATCAA"), where all flight is controlled by the FAA for the purpose of providing air traffic separation between specified activities.[2]

FAA regulations do not define or refer to any category of airspace similar to the proposed SOA, and the Navy did not seek FAA approval for the SOA designation. In announcing the proposed SOA, the Navy stated only that the "SOA will use an area of airspace within which airwings and squadrons can train at subsonic and supersonic speeds to simulate realistic combat conditions" (Secretary Lehman's Record of

---

**1.** "Special Use Airspace" is established by the FAA for those activities that "must be confined because of their nature, or wherein limitations are imposed upon aircraft operations that are not a part of those activities." 14 C.F.R. § 73.3 (1987). There are two categories of special use airspace: rulemaking and nonrulemaking. FAA Handbook 7400.2C ("Handbook") at 7001. Rulemaking special use airspace includes Prohibited Areas and Restricted Areas, where concerns of national security or hazards to nonparticipating aircraft prevent general access. Handbook at 7201, 7301. Nonrulemaking special use airspace includes alert areas, controlled firing areas, and military operations areas (MOAs). These designations are intended to segregate nonhazardous military activities from

nonparticipating aircraft; they do not bar general access. Handbook at 7001, 7500, 7501. MOAs are published in the Federal Register and depicted on FAA aeronautical charts. Current FAA regulations define military training activities as "nonhazardous." These activities include "air combat maneuvers, air intercepts, acrobatics, low altitude tactics, etc." Handbook at 7501. Supersonic flight by military aircraft is not defined as hazardous at the present time.

**2.** *See* FAA Handbook at 7505. Because ATCAA is always under air traffic control and all flight is under instrument flight rules, no designation appears on aeronautical charts.

Decision to Designate a SOA at 2, June 24, 1985). In order to comply with the National Environmental Policy Act, 42 U.S.C. § 4321 et seq. ("NEPA"), the Navy prepared an Environmental Impact Statement ("EIS") on the SOA proposal. The Draft EIS (DEIS) indicated that the "low probability" worst case conditions would include up to twenty aircraft flying at one time, with a maximum of 136 supersonic sorties flown per day. The "higher probability" worst case conditions included an average of 44 flights per day, with the SOA area used 6 days per week, 4 weeks per month (DEIS at 5–7). The Navy issued its Final EIS and Record of Decision in June 1985.[3]

In October 1985 the Sierra Club and the Nevada Outdoor Recreation Association (referred to herein as "Sierra Club") filed suit against the Secretary of the Navy and the Secretary of Transportation, challenging the authority of the Secretary of the Navy to allocate airspace for supersonic operations in derogation of the Secretary of Transportation's primary duty to do so. The federal defendants filed a motion to dismiss under Fed.R.Civ.P. 12(b)(6), on the basis that the SOA was within existing special use airspace and that the FAA does not regulate supersonic flight by military aircraft above 10,000 feet MSL. The case was referred to a magistrate who, in March 1986, recommended dismissal of the action. The district court adopted the magistrate's recommendation, construing the motion to dismiss as one for summary judgment. Sierra Club v. Lehman, 648 F.Supp. 252 (D.Nev.1986).

This timely appeal followed.

## STANDARD OF REVIEW

The district court considered matters outside the pleadings, construing the motion to dismiss as one for summary judgment. We review a district court's grant of such judgment de novo. Del Madera Properties v. Rhodes & Gardner, Inc., 820 F.2d 973, 975–76 (9th Cir.1987); Darring v. Kincheloe, 783 F.2d 874, 876 (9th Cir.1986).

## DISCUSSION

The issue before us concerns the scope of decisionmaking authority over navigable airspace and the proper exercise of that authority. The Federal Aviation Act of 1958, codified at 49 U.S.C. § 1301 et seq., established the Federal Aviation Agency in order to "provide for the safe and efficient use of the navigable airspace by both civil and military operations." H.R.Rep. No. 2360, 85th Cong., 2d Sess., reprinted in 1958 U.S.Code Cong. & Admin.News 3741; see 49 U.S.C. § 1303(c) and (e); accord United States v. Christensen, 419 F.2d 1401, 1404 (9th Cir.1969). In 1966 Congress transferred all functions, powers, and duties of the Federal Aviation Agency to the Secretary of Transportation, Pub.L. No. 89–670, sections 3(e) and 6(c)(1), 80 Stat. 931, 932, 938. The 1966 Act also established the Federal Aviation Administration ("FAA") within the Department of Transportation, to replace the Federal Aviation Agency. The Administrator of the FAA exercises the powers of the Secretary pertaining to aviation safety. 49 U.S.C. § 1655(c)(1).

Under the Federal Aviation Act, the FAA has the authority to regulate navigable airspace and prescribe rules governing the flight of aircraft. 49 U.S.C. § 1348(a), (c); § 1522. In general, the FAA has divided all navigable airspace over the United States into controlled or uncontrolled areas, based on altitude.[4] In addition to this general allocation, the FAA designates other

---

3. The adequacy of the EIS is not at issue in this appeal.

4. "Positive Controlled Airspace" is designated as that airspace between 60,000 feet MSL and 18,-000 feet MSL. 50 Fed.Reg. 5047 (Feb. 5, 1985). All flight in Positive Controlled Airspace is tracked by FAA Air Traffic Control ("ATC"), and all aircraft are required to follow Instrument Flight Rules ("IFR"). 14 C.F.R. §§ 1.1, 71.15, 91.97 (1987). "Controlled Airspace" extends from 18,000 feet MSL down to 14,500 feet MSL. In Controlled Airspace only IFR flight is allowed, 14 C.F.R. § 91.97 (1987), but ATC flight tracking is not required. 14 C.F.R. §§ 1.1 at 6, 71.15 (1987). The airspace below 14,500 feet MSL is "Uncontrolled." Uncontrolled airspace is not defined, but Visual Flight Rules ("VFR") are permitted and no ATC is provided. 14 C.F.R. §§ 1.1 at 6, 71.15 (1987).

categories of airspace for special purposes.[5]

## 1. FAA Regulation of Supersonic Flight.

Unless otherwise authorized by the Administrator, all aircraft in the United States are prohibited by the FAA from exceeding a speed of 250 knots when flying below 10,000 feet MSL. 14 C.F.R. § 91.70(a) (1987). The FAA also prohibits civil aircraft from exceeding the speed of sound within the United States, at any elevation, without a waiver from the Administrator. 14 C.F.R. § 91.55 (1987). By a Letter of Agreement dated May 18, 1978, the Administrator authorized military aircraft to exceed a speed of 250 knots below 10,000 feet MSL under certain conditions, including any military flights within FAA designated Restricted Areas or MOAs. Significantly, there is no FAA regulation at present that directly prohibits or regulates supersonic flight by military aircraft above 10,000 feet MSL, but the FAA does refer to supersonic flight in its guidelines for special use airspace restrictions.

## 2. Special Use Airspace and Supersonic Flight.

Part 7 of the FAA Handbook 7400.2C ("Handbook") "contains the policy, procedures, and criteria for the assignment, review, modification, and revocation of special use airspace." Handbook at 7000. Paragraph 7001 refers to the categories of special use airspace, including MOAs, and notes that the FAA "has the authority to make the final decision [concerning airspace use] but does not express that decision by issuing a rule, regulation, or order." Paragraph 7005, entitled "Environmental Assessment," refers to supersonic flight as follows:

> Special use airspace actions are subject to environmental assessments and procedures if the floor of the proposed area is below 3,000 feet AGL or if supersonic flight is anticipated at any altitude. Compliance with the National Environmental Policy Act (NEPA) is the respon-

sibility of the proponent under the lead agency concept. (See Order 1050.1)

Paragraph 7133 of the FAA Handbook also refers to supersonic flight. The Sierra Club contends that the intent of Paragraph 7005 is to require FAA approval before any special use airspace can be used for military training flights conducted at supersonic speeds, and that the FAA was never requested to approve supersonic military training flights in the Gabbs or Austin MOAs. We agree with the Sierra Club's interpretation of the FAA Handbook, but we disagree with its application to this case.

The FAA must approve the "assignment, review, [or] modification" of any special use airspace (Handbook at 7000, 7001). If the using agency anticipates that supersonic flight will be a part of the activities conducted within the special use airspace, that intention must be stated in the proposal to assign or modify the airspace (Handbook at 7130–7133). When supersonic flight is anticipated, the agency must prepare an environmental assessment (Handbook at 7005).

Contrary to the Sierra Club's contention, the Navy did prepare an environmental assessment for the designation of the Austin MOA in 1979. That assessment stated the Navy's intention to use portions of both the Gabbs and Austin MOAs/ATCAA for supersonic military training flights. Thus, the Navy clearly did anticipate supersonic use within the confines of the Gabbs and Austin MOAs prior to the announcement of its proposed SOA. The FAA reviewed, and approved, the 1979 request concerning the Gabbs and Austin special use airspace. Therefore, FAA approval of the proposed SOA is necessary only if there was a "modification" of existing special use airspace.

## 3. The Effects of the Proposed SOA on Existing Airspace Allocations.

The Sierra Club argues that the existing airspace allocation over NAS Fallon has been modified because (1) the SOA boundaries do not coincide with FAA designated boundaries, and (2) the activity within the airspace will increase in intensity. The Si-

---

**5.** *See* notes 1–2 and accompanying text, *supra.*

erra Club further asserts that the fact the Navy decided to prepare an EIS on the SOA proposal underscores the significance of the change, sufficient to constitute a "modification," and belies any *de minimis* characterization of the action.

The argument that the existing airspace boundaries have been modified rests primarily on the extension of the SOA into the ATCAA above the MOA airspace. As the district court noted, however, "[t]here is undisputed evidence that the FAA and the Navy agree that the Navy is allowed to use the Positive Controlled Airspace over the Nevada MOAs involved here in much the same way the Navy uses MOAs." 648 F.Supp. at 254. The extension of the SOA into airspace above the MOAs, from 18,000 feet MSL to 58,000 feet MSL, does not constitute modification of existing special use airspace because it is within the boundaries of the existing MOAs/ATCAA already approved by the FAA.

The use of the airspace will definitely intensify, however. By its own admission the Navy notes that the formerly "occasional" supersonic flights will become regular, and that the average number of sorties will increase over time (DEIS at 5–43 through 5–46). The Sierra Club submits that this change constitutes modification within the intent of Paragraphs 7130–7133 of the FAA Handbook.

Paragraphs 7130–7139 describe the "Content of Proposals" required for special use airspace actions. The Sierra Club points in particular to the requirements for a "detailed list of activities to be conducted" in the airspace, the "days per week, weeks per month, or months per year" the airspace will be used, and "the intentions regarding flight at supersonic speeds" (Handbook at 7133). The argument is that a change in any of these items indicates a "modification" sufficient to require a new proposal for approval.

The FAA Handbook does not define "modification" or identify a threshold beyond which a new proposal for "special use airspace action" is required, and we find no prior judicial or administrative interpretation of the regulations and policies at issue. We believe there is merit in the Sierra

Club's argument, but we can only conclude that, in the limited facts of this case, the SOA does not modify existing airspace designations. The general activities and the times of use in the Gabbs and Austin MOAs/ATCAA will not change. Although the number of supersonic flights will increase, the Navy anticipated supersonic use of the airspace in 1979, and the FAA approved such use without reference to frequency.

Furthermore, the decision by the Navy to prepare an EIS on the SOA proposal does not suggest that FAA approval was required. The FAA Handbook mandates compliance with NEPA whenever certain special use airspace actions are undertaken, but the Handbook does not equate NEPA compliance by itself with special use airspace action. The Secretary complied with NEPA, and with Navy guidelines designed to implement that Act (Dept. of the Navy Environmental and Natural Resources Protection Manual, OPNAVINST 5090.1 (May 26, 1983)). There is nothing in the record to indicate that the Secretary sought to change existing airspace designations.

## CONCLUSION

There is no explicit FAA prohibition on supersonic flight by military aircraft above 10,000 feet MSL; the FAA Handbook implies intent to regulate military supersonic flight, if at all, only through the assignment or modification of special use airspace. Although the Navy anticipates increased supersonic use of the Gabbs and Austin special use airspace, this increase does not constitute a "modification" of the boundaries or the purpose of the existing airspace designations. The Gabbs and Austin MOAs/ATCAA are currently approved by the FAA for military training flights, including flights at supersonic speed. We conclude that the Secretary of the Navy acted within his authority and that the approval of the Secretary of Transportation was not required.

AFFIRMED.